

**United States District Court**
**Northern District of Alabama**
**Southern Division**

| | |
|---|---|
| **Otis Patton,** | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-N-99-1971-S |
| **The City of Bessemer, et al.,** | ] |
| Defendant(s). | ] |

FILED
01 FEB 20 PM 3: 24
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
FEB 2 0 2001

**Memorandum of Opinion**

**I.   Introduction**

The plaintiff, Otis Patton ("Patton"), brings this action against defendants City of Bessemer, Chief O.R. Adams ("Adams"), Officer C. Clemons ("Clemons"), Officer Ronald S. Ware ("Ware"), Officer Terri White Corder ("Corder"), Officer James L. Holdridge ("Holdridge"), Officer Myford Little ("Little"), Officer Rocco J. Pagliarini ("Pagliarini"), Officer Steven B. Headley ("Headley"), and Sergeant Frederick Littlepage ("Littlepage"), alleging violations of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983.

The court has for consideration the defendants' Motion for Summary Judgment, filed on September 29, 2000 (Doc. No. 36).[1] The issues have been briefed by the parties and are now ripe for decision. Upon due consideration, the motion will be **GRANTED** in all respects.

---

[1] In a related matter, the court has for consideration defendants' motion to strike portions of the affidavit of Jenifer Barbee, taken on October 23, 2000 (Doc. No. 49). The court will consider this matter contemporaneously with the motion for summary judgment and will disregard any portions of the affidavit not properly before the court on summary judgment.



## II. Background

### A. Statement of Facts[2]

#### 1. Undisputed Facts

On Sunday, July 5, 1998, at approximately 6:06 p.m., police officers Ware and Clemons (the "arresting officers") were dispatched to a residence in Bessemer, Alabama, to investigate a reported incident of domestic violence. While in route, they were informed by radio that the plaintiff, one of the individuals allegedly involved in the domestic argument, was the subject of two outstanding misdemeanor warrants for his arrest in the City of Bessemer. When the arresting officers arrived at the Bessemer residence, Patton was arrested, without incident, on the two outstanding warrants. Patton informed the arresting officers that he was a diabetic. Patton was subsequently transported to the city jail ("City Jail"). He was there released to the custody of Carlton Williams ("Williams"), the warden then on duty. The events of the remainder of the evening are largely in dispute.

At or around 8:00 a.m. on Monday, July 6, 1998, Lieutenant Danny W. Johnson ("Johnson") noticed that Patton appeared to be intoxicated. After questioning Patton about his condition, Johnson instructed Patton to call someone so that they could bring him his medicine.[3] Pursuant to Johnson's instructions, Patton made a phone call to ask that his medication be delivered to him. Later that same day, at or around 5:30 p.m., officers

---

[2] In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), cert. denied, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[3] The record shows that Patton had access to three operating telephones.

Cochran and Little were advised that Patton was ill. Soon thereafter, Patton's condition was brought to the attention of Sgt. Littlepage and, at or around 6:50 p.m., Sgt. Littlepage requested assistance from the Bessemer Fire and Rescue team. Within minutes paramedics arrived to examine the plaintiff. He advised them that he had been without insulin for a few days. At or around 7:15 p.m, Patton was transported to Cooper Green Hospital, located in Birmingham, Alabama.[4] At the hospital, Patton was diagnosed with diabetic ketoacidosis, a life threatening condition for diabetics. He remained in the hospital until July 15, 1998. From the time of Patton's arrest until the time the paramedics were dispatched to assist him, roughly 24-hours elapsed.

### 2. Disputed Facts

Patton maintains that he advised the arresting officers that his insulin was located in the Bessemer, Alabama, residence where he was arrested. The arresting officers, however, maintain that Patton informed them that his medication was located in Birmingham, Alabama. Rather than escorting Patton to Birmingham to retrieve his medication, the arresting officers allegedly advised Patton that, once they arrived at the City Jail, he would be permitted to telephone someone to bring his medication to him. According to Officer Ware, when given the opportunity to do so, Patton refused to use the telephone. In direct contrast to Officer Ware's affidavit testimony, Patton maintains that the arresting officers neither offered nor allowed use of a telephone. Instead, according to Patton, they laughed

---

[4] A few moments after the ambulance transporting Patton departed, a woman arrived at the City Jail with Patton's medication.

3

at his request for medication. According to Patton, he did not gain access to a phone until Monday, July 6, 1998.

Patton was relinquished to the custody of Officer Williams, the acting jail warden, at or around 7:00 p.m. on Sunday, July 5, 1998. A few hours later, at 10:00 p.m., Williams was relieved by Officer Corder. At 6:00 a.m. on Monday, July 6, 1998, Corder was relieved by Officer Holdridge. Holdridge remained on duty until 2:00 p.m., when he was replaced by Officer Little. Little performed an abbreviated shift as jail warden (until roughly 5:00 p.m.) because he was called upon to act in his more familiar role as Bailiff in the Municipal Court.

According to the affidavit testimony of defendants Williams, Corder and Holdridge, their respective "shifts" were uneventful; they received no reports of inmates being ill or otherwise in need of medical attention. However, at or around 5:30 p.m. on Monday, July 6, 1998, while performing his duties as bailiff, Officer Little passed by Patton's jail cell and learned that Patton was ill and in need of assistance. Also around 5:30 p.m., while performing routine cell checks, Officer Cochran was told by other detainees that Patton was ill. According to the affidavit testimony of officers Little and Cochran, Patton's illness was immediately brought to the attention of Sgt. Littlepage, who allegedly questioned him and, soon thereafter, instructed Officer Pagliarini to call paramedics to assist him.

Patton, however, relates a very different version of events. For instance, he maintains that, just hours after arriving at the Bessemer City Jail, he became ill and requested medical assistance. In fact, according to Patton, medical assistance was requested from the time he was "booked in" the jail until the time he passed out and was transported to Cooper Green Hospital. Patton further contends that Jenifer Barbee, his court appointed attorney, and not

4

officers Little and Cochran, brought his medical condition to the attention of Sgt. Littlepage. According to the affidavit testimony of attorney Barbee, Sgt. Littlepage commented that Patton was "faking it" and refused to provide medical assistance.

### B. Procedural History

On July 29, 1999, as a result of the events that allegedly transpired following his arrest, Patton filed suit in this Court against the City of Bessemer and Chief O.R. Adams. Patton later amended his Complaint to state claims against Officers Clemons, Ware, Corder, Holdridge, Little, Pagliarini, Headley, and Littlepage. Since the filing of his Amended Complaint, Patton has voluntarily dismissed the City of Bessemer and Chief O.R. Adams as party-defendants. (Plf. Response at p. 12). The remaining defendants are sued in their individual capacities for allegedly violating Patton's rights under the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The

5

movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion

Section 1983 provides judicial remedies to a plaintiff who can prove that a person acting under color of state law committed an act that deprived him of a right, privilege, or immunity protected by the Constitution or laws of the United States. See 42 U.S.C. § 1983. Because § 1983 does not in and of itself provide any substantive right, the analysis of any claim brought under that section must begin by identifying the constitutional, statutory, regulatory, or decisional basis upon which the right that was allegedly violated is founded. Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870-71, 104 L. Ed. 2d 443 (1989).

As previously mentioned, Patton maintains that the defendants were deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendment. In their motion for summary judgment, the defendants maintain that they are entitled to qualified immunity from suit as well as from liability. The first step in any qualified immunity analysis is to determine whether the plaintiff has asserted a cognizable claim that his federal rights have been infringed. See Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991) (Before a court can grant qualified immunity, it first should determine whether the "plaintiff has asserted violation of a constitutional right at all"). If Patton has failed to sufficiently allege a violation of a federal right, it is axiomatic that he has failed to allege a violation of a clearly established right. See Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995).

### A. Denial of Medical Care

The United States Supreme Court has held that "deliberate indifference" to an inmate's serious medical needs will give rise to a claim under § 1983 for a violation of either

the "cruel and unusual punishment" clause of the Eight Amendment or the "due process" clause of the Fourteenth Amendment.[5] *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976), *reh'g denied*, 429 U.S. 1066 (1977) (The Eighth Amendment proscription against cruel and unusual punishment prevents prison personnel from subjecting an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. In order to rise to the level of deliberate indifference, the conduct of public officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain. *Bass v. Sullivan*, 550 F.2d 229 (5th Cir.), *cert. denied*, 434 U.S. 864 (1977).

The "deliberate indifference" standard was initially established by the Supreme Court in *Estelle*, and clarified by the Supreme Court's subsequent decisions in *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991), and *Farmer v. Brennan*, 511

---

[5] A government official's treatment of a pretrial detainee is governed by the due process clause of the Fourteenth Amendment, *see Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S. Ct. 1861, 1872 n. 16, 60 L. Ed. 2d 447 (1979), while the cruel and unusual punishment clause of the Eighth Amendment governs an official's treatment of a convicted prisoner. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). The Eleventh Circuit has held that the minimum standard for proving medical care to a pretrial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs. *See Hamm v. De Kalb County*, 774 F.2d 1567, 1573-74 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986).

9

U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). In *Wilson*, the Supreme Court explained that the Eighth Amendment applies only to punishments and, in order for prison conditions to constitute a "punishment" within the meaning of the Eighth Amendment, the inmate must establish: (1) an objectively serious deprivation, and (2) punitive intent. *Campbell*, 169 F.3d at 1363 (citing *Wilson*, 501 U.S. at 297-299).

In *Farmer*, the Supreme Court elaborated upon the subjective component of the deliberate indifference test. The Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38. Therefore, based on *Farmer*, "liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of 'an excessive risk to inmate health or safety' and disregarded that risk." *Campbell*, 169 F. 3d at 1364 (quoting *Farmer*, 511 U.S. at 837). In other words, the defendant must have a subjectively "sufficient culpable state of mind." *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996). Proof that he or she failed to perceive a risk is insufficient. *Campbell*, 169 F. 3d at 1364. Whether the defendant had the requisite knowledge of the seriousness of the

10

inmate's medical needs is a question of fact subject to proof in the usual ways, including inferences to be drawn from circumstantial evidence. *See Farmer*, 511 U.S. at 840; *Campbell*, 169 F.3d at 1364. Mere negligence, however, will not rise to the level of a constitutional violation. *See Estelle*, 429 U.S. at 97.

To summarize, based on the reasoning embraced in *Estelle*, *Wilson* and *Farmer*, in order to establish "deliberate indifference," an inmate must prove: (1) an objectively serious deprivation, and (2) a subjective intent to punish. In the context of a claim for denial of medical care, the context applicable to the case at bar, the Eleventh Circuit has recently elaborated upon these subjective and objective components. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). For instance, according to *Taylor*, in order to establish an objectively serious medical deprivation, the plaintiff must demonstrate both an objectively "serious" medical need and an "objectively insufficient" response to that need. *Id.* A "serious" medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Ctr*, 40 F.3d 1176, 1187 (11th Cir. 1994). An "objectively insufficient" response is more than mere negligence, rather, it must be "poor enough to constitute 'an unnecessary and wanton infliction of pain. . .'". *Taylor*, 221 F.3d at 1258 (quoting *Estelle*, 429 U.S. at 105-106). Likewise, in order to establish a subjective intent to punish, the plaintiff must demonstrate the defendant(s)' subjective awareness of facts signaling the need, as well as an actual inference of required action from those facts. *Id.*

### B.      Application to the Individual Defendants

With the foregoing standards in mind, the court must determine whether the evidence, viewed from the standpoint of the plaintiff and drawing all justifiable inferences in his favor, is sufficient to create a genuine issue of material fact regarding whether any of the defendants were deliberately indifferent to the plaintiff's serious medical needs, and if so, whether those defendants are entitled to the benefit of qualified immunity. Given that Patton encountered different defendants at various stages of his illness, and given the significance of each individual defendant's knowledge and subjective intent, the court will address the alleged action (or inaction) of the defendants in the chronological order in which they encountered Patton.

### 1.      Defendants Ware and Clemons (Arresting Officers)

It is undisputed that, at all times relevant to claims at issue, Patton was under a doctor's care for diabetes. Diabetes, as this court has previously recognized, "may constitute a serious medical condition, giving rise to serious medical needs." *Tunstill v. Whisante*, CV-95-N-2301-NE (unpublished opinion, Dec. 8, 1997) (citing numerous cases), *aff'd* 166 F.3d 353 (11th Cir. 1998). It is also undisputed that Patton informed officers Ware and Clemons of his diabetic condition at the time of his arrest. The issue before the court, therefore, is whether the response of officers Ware and Clemons was "objectively insufficient," and if so, whether that response was intended to punish Patton.

Although the arresting officers were aware of Patton's medical condition, rather than immediately retrieving his insulin, they advised Patton that he would be allowed to use a phone and/or see a nurse after he was "booked in" the City Jail. The officers subsequently

12

escorted Patton to the nearby City Jail, advised the warden on duty of Patton's "situation," and returned to their patrol. According to Patton's affidavit testimony, a few hours later he became ill due to a lack of medication. Patton takes the position that the actions of the arresting officers rise to the level of "deliberate indifference" to his serious medical needs. The court disagrees.

The evidence suggests that, while in the care and custody of officers Ware and Clemons, Patton appeared to be in good health, exhibited no outward signs of diabetic ketoacidosis, and never requested medical assistance or suggested there was any immediate need for medication. While the wiser course might have been to procure Patton's insulin before "booking" him into the jail, given his healthy appearance and the abundance of available telephones at the City Jail, no reasonable jury could conclude that the response of officers Ware and Clemons was "objectively insufficient" let alone "deliberately indifferent." There is surely no requirement that arresting police officers be wise. The requirement is that they not be deliberately indifferent to the plaintiff's serious medical needs. Since Patton has failed to establish with sufficient evidence the elements of his Fourteenth Amendment claim, summary judgment will be granted in favor of Ware and Clemons.

### 2. Defendants Corder and Holdridge

As mentioned above, Corder and Holdridge were the wardens on duty soon after Patton was booked into the City Jail by the arresting officers. In their affidavit testimony, these defendants maintain that they performed routine cell checks every thirty minutes (roughly from 10:00 p.m. on Sunday, July 5, 1998, until 2:00 p.m. on Monday, July 6, 1998), but

received no requests for medical attention or reports of inmates being ill. (Def. Ex. 7, 8). In response, Patton makes a vague allegation that he "made requests to several jailors to see a doctor or a nurse on several occasions from the time . . . [he] was booked into the Bessemer City Jail until the time . . . [he] passed out. . . ." ( Plf. Ex. 1, Affidavit of O. Patton, p. 2).

Although Patton undoubtedly discussed his medical condition with Lt. Johnson (approximately 8:00 a.m., July 6, 1998) as well as officers Little and Cochran (approximately 5:30 p.m., July 6, 1998), he does not contend, and the record does not suggest, that Patton or anyone else related his need for medical attention to Corder or Holdridge. In fact, Patton admits that he, along with other inmates, slept throughout Officer Corder's shift. (Plf. Response at ¶ 24). Because one must be subjectively aware of another's medical needs in order to act with deliberate indifference to those needs, *see McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), and Patton has failed to raise a genuine issue with respect to actual knowledge of officers Corder and Holdridge, these two defendants are entitled to summary judgment on Patton's Fourteenth Amendment claim.

### 3. Defendants Little, Cochran, Pagliarini and Littlepage

Based on the evidence before the court, defendants Little, Cochran, Pagliarini and Littlepage were the only defendants to interact with Patton prior to the time paramedics were called to his assistance.[6]

---

[6] Patton also named Officer Stephen L. Headley as a defendant in the present matter. However, based on his undisputed affidavit testimony, Officer Headley's shift as jail warden commenced at 8:00 p.m. on Monday, June 6, 1998, roughly forty-five minutes after Patton was transported to the hospital. Since Patton has failed to present any evidence suggesting Officer Headley was subjectively aware of Patton's medical condition prior to the time paramedics were summoned to his assistance, Officer Headley is entitled to summary judgment with respect to Patton's deliberate indifference claim.

According to his affidavit testimony, Officer Little assumed the role of jail warden on or about 2:00 p.m. on Monday, July 6, 1998, presumably replacing Officer Holdridge. (Def. Ex. 13, affidavit of M. Little, p. 2). As previously noted, Officer Little remained at his post as warden for only some three hours, that is until roughly 5:00 p.m., when he was called upon to act in his more familiar role as bailiff in the Municipal Court. (*Id.*). During his abbreviated "shift" as jail warden, Little maintains that he received no reports or complaints of inmate sickness. (*Id.*). However, at or around 5:30 p.m., while acting in his capacity as bailiff, Little learned that Patton was sick and needed assistance. (*Id.* at p. 3). In accord with the Procedural General Orders ("PGO") of the Bessemer Police Department, Little testified that he asked the dispatcher to inform Sgt. Littlepage, the "Shift Supervisor," about Patton's illness. (*Id.*; Def Ex. 18, PGO #26).

At or around 5:30 p.m. on July 6, 1998, at approximately the same time Officer Little allegedly asked the dispatcher to inform Sgt. Littlepage of Patton's illness, Officer Cochran encountered Patton while performing routine cell checks. According to his affidavit testimony, Officer Cochran was informed by other detainees that Patton was ill. (Def. Ex. 11, affidavit of B. Cochran, p. 2). Shortly thereafter, Cochran brought Patton to the front of the jail where he was questioned by Officer Pagliarini, the acting jail warden. (*Id.*). Officer Pagliarnini maintains that, following PGO procedures, he examined Patton and advised the Shift Supervisor, Sgt. Littlepage, that Patton was feeling ill and was vomiting. (Def. Ex. 10, affidavit of R. Pagliarini, p. 2).

At or around 6:15 p.m, Sgt. Littlepage arrived at "headquarters" and personally examined Patton. In his affidavit, Sgt. Littlepage testified that he advised Patton that, as a

15

diabetic himself, he was familiar with the symptoms associated with high or low blood sugar. (Def. Ex. 14, affidavit of F. Littlepage, p. 2). Because Sgt. Littlepage did not recognize Patton's symptoms as those of a diabetic, he advised Officer Pagliarini to "keep a close watch" on Patton and not to return him to a jail cell. (*Id.*). Sgt. Littlepage returned to his office.

At or around 6:45 p.m., Patton's court appointed attorney, Jenifer Barbee, arrived at the City Jail to interview her client. Upon meeting with Patton, Barbee grew concerned about Patton's condition. (Def. Ex. 3, affidavit of J. Barbee, p. 2). Barbee allegedly knocked on Sgt. Littlepage's office door and informed him that Patton was diabetic and in need of insulin. (*Id.*) According to Barbee, Sgt. Littlepage replied "he's not sick, he's faking it . . . I'm a diabetic and I'm not like that when I don't take my medicine." (*Id.* at p. 3). Sgt. Littlepage allegedly returned to his office and closed the door. (*Id.*). Barbee then proceeded to the Municipal Court and informed the Judge, in chambers, that Patton "was in serious shape and needed insulin and medical attention." (*Id.* at p. 4). At or about the same time Barbee was making her way to the Municipal Court, Sgt. Littlepage, after "personally observ[ing] Patton throwing up," directed Officer Pagliarini to call the paramedics. (Def. Ex. 14, affidavit of F. Littlepage, p. 2). The paramedics arrived at approximately 6:51 p.m. and advised Sgt. Littlepage that Patton's "blood sugar was out of control and that he needed to be hospitalized." (Def. Ex. 14, affidavit of F. Littlepage, p. 2). At or around 7:15 p.m., Patton was transported to Cooper Green Hospital where he was diagnosed with diabetic ketoacidosis. He remained in the hospital until July 15, 1998.

The court is satisfied that no reasonable jury, on this evidence, viewed in a light favorable to Patton, could conclude that officers Little, Cochran, or Pagliarini were deliberately indifferent to Patton's serious medical needs. It is undisputed that none of these defendants acquired personal knowledge of Patton's medical condition and need for help until about 5:30 p.m. on Monday, July 6, 1998. Rather than ignoring his condition, as Patton suggests, each of the officers followed the applicable procedural guidelines, promptly notified Sgt. Littlepage, and had Patton in the front office for questioning and examination within thirty minutes. (Def. Ex. 18). Within one and one-half hours of the time they received notice of this condition, Patton was under the care of emergency medical technicians. These defendants, Little, Cochran and Pagliarini, are entitled to summary judgment on Patton's Fourteenth Amendment claims.

The large majority of Patton's allegations are levied against Sgt. Littlepage, the officer with the authority to request outside medical assistance. Specifically, Patton maintains that, by delaying his access to medical treatment, Littlepage was deliberately indifferent to his serious medical needs. As previously mentioned, it is undisputed that Patton was suffering from diabetes, a serious medical condition. It is also undisputed that Patton's condition (or potential condition) was brought to Littlepage's attention at or around 6:15 p.m. on Monday, July 6, 1998. It is further undisputed that Littlepage called the paramedics to assist Patton within approximately thirty minutes of learning of Patton's medical condition.

It is well settled that, depending on the circumstances, an unexplained and significant delay in securing medical treatment may rise to the level of a constitutional claim. *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.), *cert. denied*, 496 U.S. 928, 110 S. Ct. 2624, 110 L. Ed. 2d 645 (1990); *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988). "The tolerable length of delay in providing medical attention depends on the nature of the medical needs and the reason for the delay." *Harris*, 21 F.3d at 393-394. For instance, with respect to emergency needs that are obvious to any ordinary and reasonable person, a delay of a few hours or even minutes in an official's reaction may be sufficiently serious so as to rise to the level of deliberate indifference. *Id.* at 394.

Littlepage maintains that medical assistance was momentarily delayed because, as a diabetic himself, he did not recognize the symptoms Patton displayed as those of a diabetic. (Def. Ex. 14, affidavit of F. Littlepage, p. 2). According to Littlepage, he became aware of the serious nature of Patton's medical condition only when he witnessed Patton vomiting in the front office. As previously mentioned, according to the Supreme Court in *Farmer*, Littlepage's requisite knowledge of the seriousness of Patton's medical condition is a question of fact subject to demonstration in the usual ways, including inferences to be drawn from the circumstantial evidence. *See Farmer*, 511 U.S. 825.

In support of his contention that Littlepage actually knew the seriousness of his medical condition, Patton cites the court to the Eleventh Circuit's decision in *Lancaster v. Monroe County*, 116 F.3d 1419 (11th Cir. 1997). In *Lancaster*, Harold Lancaster, a chronic alcoholic suffering from a withdrawal-induced seizure, died as a result of injuries sustained

18

while a pre-trial detainee at the county jail in Monroe County, Alabama. *Id*. Lancaster's wife, the administrator of his estate, brought suit against the sheriff and jailors alleging the defendants were deliberately indifferent to her husband's serious medical needs. *Id*. The evidence demonstrated that, immediately following Lancaster's arrest, his wife and father constantly called the officers and jailors on duty and informed them that Lancaster suffered from delirium tremens (DTs) and that he would experience severe seizures when the effects of the alcohol wore off. *Id*. at 1421. In fact, Lancaster's father visited the jail, attempted to see his son, and once again personally warned the officers that Lancaster required constant supervision because seizures were imminent. *Lancaster*, 116 F.3d at 1422. At approximately 9:30 a.m. on the morning following his arrest, Lancaster experienced a severe seizure, fell backwards out of his top bunk, and subsequently died from a severe head injury. *Id*. at 1423.

Based on these facts, the court in *Lancaster* held that the plaintiff had presented sufficient evidence from which a jury could find that each defendant "knew [the decedent] had urgent medical needs that would be significantly exacerbated by delay," that each defendant "planned to keep [the decedent] in jail without medical supervision or treatment until he had a seizure," and each defendant "delayed obtaining treatment for [the decedent] until after he suffered a seizure." *Id*. at 1426-27.

This case, however, is not *Lancaster*. There was strong evidence in *Lancaster* to support a finding that the defendants had actual knowledge of the plaintiff's medical condition and did nothing to address it. Here, viewing the evidence in a light most favorable to Patton, a reasonable jury could not conclude that Littlepage actually knew the urgency

19

of Patton's medical condition until that condition was brought to his attention. Based on the evidence before the court, Littlepage's hesitancy derived, in part, from the fact that three working telephones were at all times available for inmate use and, in part, because he did not recognize Patton's symptoms as those of a diabetic. While Littlepage's attempts to diagnose Patton's medical condition may rise to the level of negligence, given the minimal facts at his disposal at 6:15 p.m. on Monday, July 6, 1998, a reasonable jury could not conclude that Littlepage actually knew the seriousness of Patton's condition and deliberately delayed medical assistance for thirty-minutes.

Summary judgment will also be granted in favor in Sgt. Littlepage with respect to Patton's Fourteenth Amendment claim.

## V.    Conclusion

Because the plaintiff is unable to create a genuine issue of material fact with regard to the merits of his Fourteenth Amendment claims, the court does not reach qualified immunity issues. The defendants' Motion for Summary Judgment will be **GRANTED** by an appropriate order in conformity with this opinion. Costs will be **TAXED** against the plaintiff.

Done, this __20th__ of February, 2001.

_____
Edwin Nelson
United States District Judge

20